Filed 10/8/20  Mandujano v. Johnston CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROBERT SIERRA MANDUJANO, | D076422 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2017-00042932-CU-PA-CTL) |
| STEPHEN PATRICK JOHNSTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frederic L. Link, Judge.  Affirmed.

Niddrie Addams Fuller Singh and John S. Addams; Nicolson Law Group, Daniel S. Cho and Joshua W. Miller, for Defendant and Appellant.

Gomez Trial Attorneys and John H. Gomez, Jeremiah A. Lowe and Victoria J. Lazar; Law Office of Martin N. Buchanan and Martin N. Buchanan for Plaintiff and Respondent.

Defendant Stephen Patrick Johnston appeals the judgment in favor of Robert Sierra Mandujano based on a jury award of $2,726,574, after

Stephen[1] in July 2016 rear-ended a car being driven by Robert's son in which Robert was riding as a passenger. At trial Stephen stipulated to liability for the accident, but disputed the cause, nature, and extent of Robert's claimed injuries. The court—after hearing the testimony of the medical experts, including Stephen's, all of whom confirmed that Robert sustained harm to his back as a result of the collision—granted a directed verdict in favor of Robert on causation, finding there was no substantial evidence proffered by Stephen to show the injury to Robert's back was not caused by the collision.

On appeal, Stephen seeks a new trial, contending the court erred in directing a verdict on causation. Alternatively, he asks this court to (i) reverse Robert's award for future loss of earnings, claiming this award was speculative because Robert at trial continued to work for the same company he worked for before the accident; and (ii) order a new trial on Robert's award for future noneconomic damages, or, in the alternative, (iii) reduce the amount of this award as this court deems appropriate, because it too was speculative as it was based in part on anxiety Robert might suffer if he is required to find a less-physically demanding job due to his back injury.

As we explain, we conclude the court did not err in granting a directed verdict on causation. We further conclude the jury's award of economic damages for future loss of earnings, and its award of noneconomic damages for pain, suffering, and other similar categories of harm including anxiety, were not speculative and were supported by substantial evidence. Affirmed.

---

[1] Because the parties and/or witnesses in some instances share the same last name, for clarity we will refer to certain parties and/or witnesses by their first names.

BACKGROUND AND PROCEDURAL HISTORY

*Robert*

Robert grew up in Carlsbad, California. He began working for his father after completing the 11th grade, and did not finish high school. At some point, Robert began working in construction for AT&T. At the time of trial, Robert was almost 48 years old, and had worked as a laborer for 22 years with HCI, a company that performed subcontract work for AT&T.

Robert at trial testified that he was still working for HCI, despite the July 2016 accident (discussed *post*). He described his job as "physically demanding," as it required a two-man crew to "break . . . concrete [and] asphalt, [and] expose all the cables so that [AT&T technicians could] do all the repairs and maintenance on the cables." Robert further testified that despite being a foreman at the jobsite, he was still required to perform an equal share of physical labor, including using a 90-pound jackhammer.

Before the July 2016 car accident, Robert testified that he had no problems performing his work at HCI; that despite the physical labor, he enjoyed it because he was outdoors, felt a sense of accomplishment, and liked working with his hands and body; and that he had never had "any back problems."

*The Accident*

Robert's son Adrian Mandujano, who was 25 years old at the time of the April 2019 trial, was driving his Jeep Cherokee on July 11, 2016. Adrian testified that Robert was seated in the front passenger seat, and that his younger sister Mikayla was seated in the backseat, directly behind Adrian. Everyone was wearing seat belts.

About five to 15 seconds before the collision, Adrian testified they were stopped in freeway traffic when they suddenly felt a "big impact."

3

Immediately after the accident, Mikayla began crying and was "hysterical." Robert made sure his two children were "okay," and, according to Adrian, Robert was more focused on Mikayla than himself because she was so upset.

Stephen testified he had been at the beach in Oceanside before the accident. After leaving the beach, Stephen drove south on Interstate 5 in his father's Chevy Silverado. Stephen's friend was in the passenger seat. Stephen described traffic as "heavy" and "stop and go."

Before the accident, Stephen admitted he was watching cars entering the freeway from the oncoming ramp. When, after a "full five seconds" his eyes returned to the road in front of him, Stephen saw the Jeep driven by Adrian stopped directly ahead. Stephen swerved to the right, but was unable to avoid the collision, as the Chevy struck the right side of the back of the Jeep.

Stephen testified that the force of the impact caused the driver and passenger airbags to deploy in the Chevy, and that the Chevy was "totaled." After pulling over to the right shoulder of the freeway, Stephen asked Robert if he was "okay." Robert responded that he and his family were "okay."

Sergeant Patrick Williams of the California Highway Patrol responded to the scene, investigated the accident, and ultimately prepared a report. Sergeant Williams testified that the collision occurred close to the Oceanside Boulevard crossing; that as part of his investigation, he interviewed Robert, who reported that "[a]ll parties in [the Jeep] had a complaint of pain"; and that Robert immediately after the collision complained of "pain to his back."

Sergeant Williams testified there was damage to the rear, right side of the Jeep, but he did not see any damage to the front of that car. Sergeant Williams thus concluded in his report that the collision involved only two vehicles; and that the severity of the accident was "[m]inor to moderate."

4

*Robert's Injuries and their Cause*

About a year after the accident, Robert consulted with Sanjay Ghosh, a board-certified neurosurgeon. Prior to consulting with Dr. Ghosh, Robert had seen spine surgeon Paul Kim, who had recommended that Robert undergo surgery for his back injury.

As Robert's treating physician, Dr. Ghosh testified he reviewed films and imaging of Robert's spine. Using a model of the human spine, Dr. Ghosh explained to the jury that Robert at the L-5 level was born with what Dr. Ghosh called a "pars defect[,] or a weakness in that joint, so instead of being bridged with bone . . . [it was] linked together with fibrous tissue." Dr Ghosh further explained, "It would be as if you had two bricks, instead of being held together with solid concrete, they're held together by glue or rubber cement. So they're stuck together, but they're a little wiggly and a little weak."

Dr. Ghosh added, "So this is a key issue, because in the subject motor vehicle accident, which Mr. Mandujano was rear—involved in the rear-end collision, this pars defect, this weak point, fractured. It fractured and it resulted in significant instability and slippage of the vertebrae causing nerve compression and symptoms of lumbar radiculopathy, which is back pain radiating down the right leg with numbness and weakness. In addition, what's not demonstrated here is he also suffered a herniation in his L-4/5 disc of his lumbar spine."

When asked if Robert would have experienced symptoms if his "fibrous tissue" had been fractured before the collision, Dr. Ghosh testified, "[I]f this was fractured apart and unstable, the way I saw it at the time of surgery, before the accident, [Robert] most certainly would have had severe back pain and/or leg pain prior to the accident."

In determining when the "pars defect fracture" to Robert's back occurred, Dr. Ghosh testified he analyzed Robert's medical history. Dr. Ghosh further testified, "So, in Mr. Mandujano's history, yes, he's had a very physical job, but he never had back issues, he never had to see a doctor or chiropractor for his back until he had this car accident, and he had this car accident and he's been having all of this pain and seeing spine surgeons and getting imaging."

Dr. Ghosh went on to explain that Robert's February 2018 CT scan showed "acute traumatic injury" through the pars defect at the L-5 region in his back. Using this same scan, Dr. Ghosh also pointed out for the jury that Robert had a "spondylolisthesis," as Robert's L-5 vertebrae had "slipped forward quite considerably," causing the nerve to become "pinched or guillotined, and that will give radiculopathy, which means pinched nerve symptoms. Lay people call it sciatica, but it means the nerve is compressed in the spine and giving symptoms down the leg."

Based on Robert's medical history, Dr. Ghosh concluded to a "reasonable degree of medical certainty" that Robert's "fractured pars, disruptive pars and slippage of spondylolisthesis" was "consistent with traumatic injury" caused by the July 11 collision. Dr. Ghosh further supported his findings using an MRI of Robert's back from November 2016, which Dr. Ghosh opined objectively showed the symptoms Robert was reporting as a result of the collision.

Because Robert then was experiencing "significant symptoms" with his back, like Dr. Kim, Dr. Ghosh recommended Robert undergo surgery to alleviate his back and right-leg pain, as Dr. Ghosh did not believe Robert's back would get better "on its own." Dr. Ghosh also recommended surgery because Robert was experiencing "weakness in his legs," which was

6

concerning because without treatment, Dr. Ghosh opined that "weakness could progress" to a "gradual loss of motor function."

Dr. Ghosh testified Robert did not want surgery because he was worried about his ability to return to work and "provide for his family," and worried about the surgery itself, as Dr. Kim previously had recommended Robert undergo an "anterior/posterior surgery," which was a more extensive procedure than the one recommended by Dr. Ghosh.

*Robert's Surgery and the Risk of Returning to a Physically Demanding Job*

In March 2018, Dr. Ghosh performed a two-level lumbar fusion surgery on Robert's spine. Using a minimally invasive technique, Dr. Ghosh testified he removed herniated disc material compressing Robert's nerves; implanted "plastic spacer[s]" into the disc space and used Robert's own bone and synthetic bone to stop the vertebrae from slipping; and implanted six screws, two rods, and fused that segment of Robert's spine to stabilize it, allowing his L5-S1 to be realigned.

Despite being about $30,000 to $50,000 more expensive than the procedure recommended by Dr. Kim, which would have required "going through [Robert's] stomach," Dr. Ghosh performed the less-invasive procedure because it not only was the "best way" to treat Robert, but also provided Robert the best chance to return to work sooner, which Dr. Ghosh noted was of "vital importance" to Robert. Using what Dr. Ghosh referred to as the "front/back approach" suggested by Dr. Kim, Robert likely would have missed work for at least six months, and potentially up to a year.

After the surgery, as Robert healed he continually asked Dr. Ghosh when he could return to work, as Robert was "highly motivated" to resume working. About three or four months after the surgery, Dr. Ghosh

"release[d]" Robert back to work. Dr. Ghosh did so because Robert's leg pain and weakness had resolved, and Robert was doing well.

However, Dr. Ghosh then shared with Robert his concerns about Robert returning to a "very physical job," particularly after Robert disclosed that his employer did not have work allowing for "light" or "modified" duty. Dr. Ghosh testified he informed Robert that he "would be at risk for degenerating the next segment of his spine simply because the fusion is rigid and the—now the forces that were previously distributed amongst his entire lumbar spine are going to be concentrated at the L-3/4 level. So I felt it was safe for him to return to work, he could function at work, but I advised him that he should be careful when lifting and . . . I really ultimately wanted him to get a different job eventually."

Dr. Ghosh consulted with Robert on March 6, 2019, or about a month before trial began. Dr. Ghosh noted that once a person has a portion of his or her spine fused, there is a "significant chance that the next level [of vertebrae] will wear out and become problematic," a condition called "adjacent segment disorder." Dr. Ghosh noted this condition results from the loss of distribution of motion among all the vertebrae, putting more strain on the remaining unfused vertebrae. At the March 6 consult, Dr. Ghosh noted Robert was having issues "at the L-3/4 level" because of his work ethic and because he "has a very physical vocation."

Dr. Ghosh opined to a reasonable degree of medical certainty that Robert should engage in vocational rehabilitation, as Robert had "hardware in his spine" and was already "showing signs of this adjacent segment disease." He further opined that Robert at some point will need a fusion of the L-3, L-4 level; that if Robert changed vocation to something non-physical, that fusion "more likely than not will occur in 20 years"; but that if Robert

8

remained in his same line of work, that fusion will "more likely than not occur in the next 5 to 10 years."

In either case, Dr. Ghosh believed it was not a question of if, but when, Robert would need another spinal surgery based on his recent symptomatology. However, Dr. Ghosh recommended Robert go as long as possible without an additional surgery because if Robert's L-3/4 was fused, Robert "then run[s] the risk of having to fuse the next level up." Dr. Ghosh opined that risk increased if Robert chose not to get into another line of work.

Dr. Ghosh further testified that going forward, about every two years Robert will need an injection of an anesthetic steroid at the L-3/4 level for pain management; and that Robert will also require physical therapy, about 20 sessions, after two years. Dr. Ghosh opined to a reasonable degree of medical certainty that Robert will always experience some level of pain as a consequence of the collision and the resulting surgery to his spine.

*Stephen's Medical Expert Agrees Robert Suffered Harm in the Collision Caused by Stephen*

The record shows at the conclusion of Dr. Ghosh's testimony, the defense called (out of order) its own medical expert, Larry Dodge. Dr. Dodge was retained to review Robert's medical records, obtain his medical history, and conduct an independent medical examination in order to provide "an opinion as to extent of injury, reasonable medical treatment, things of that nature." Dr. Dodge testified he typically performs about seven or eight spine surgeries a week; sees about 150 to 200 patients during this same time frame; and estimated he had done over 11,000 spinal surgeries and about 4,000 lumbar decompressions and fusions during the course of his medical career. Dr. Dodge prepared a 15-page report with his findings and was also deposed in connection with his opinions in this case.

9

With regard to Robert's pars defect, Dr. Dodge testified that he was very familiar with this condition; that about 3 to 5 percent of the population have this "bone defect" in their spine, which is congenital or develops during childhood or adolescence; and that persons with this defect are "more prone" to back pain, although not all individuals with this defect develop back pain. Dr. Dodge further testified that persons with a pars defect may develop back pain absent any trauma; and that such pain can be significant.

Dr. Dodge testified one of the findings he included in his report was that Robert had "preexistent isthmic spondylolisthesis and degenerative disc disease at L4-5 and L-5/S-1," adding, "What I was stating is there's no physician, in my opinion, who would not disagree with the fact [Robert] had degenerative disc disease or wear and tear on his disc prior to this accident at both [these locations], and there is also no physician who would disagree that the bone defect in his back predated the accident. That does not come on acutely." Thus, Dr. Dodge disagreed with Dr. Ghosh's testimony that the L-4/L-5 bulge in Robert's back was caused by the car accident, noting a person does not "develop a degenerative disc within a matter of a couple of months," as in Dr. Dodge's view it took "years of time" to develop such a condition.

Despite his disagreement with Dr. Ghosh regarding the source of the bulge in Robert's back at L-4/5, Dr. Dodge testified that the medical care Robert received, including the surgery, was "reasonable" because of the "instability" in Robert's back. However, Dr. Dodge did not agree that Robert would need another surgery at some point for adjacent segment disease, opining with reasonable medical certainty that Robert's need for an additional fusion was somewhere in the "realm of 5 to 10 percent." Dr. Dodge further opined any residual back pain Robert was experiencing was most

10

likely caused by the major surgery Robert had underwent on his back; and by arthritis, as Robert had a physically demanding job.

Dr. Dodge had no qualms with Robert returning to work about three or four months after the surgery. Unlike Dr. Ghosh, however, Dr. Dodge also believed it was reasonable for Robert to return to his physically demanding job and that Robert would not need to switch careers to stave off another surgery for adjacent segment disease. Dr. Dodge believed the more active Robert remained, the better off Robert would be.

Dr. Dodge was asked about Robert's "nerve impingement." Dr. Dodge testified that, while Robert likely had narrowing around the nerve in the foramina before the accident as a result of his shifting vertebrae (i.e., spondylolisthesis), the "accident aggravated that nerve." Dr. Dodge opined that before the accident, Robert's spine was not stable as a result of the pars bone defect. But Dr. Dodge further noted there was "no evidence that it was bothering him a great deal prior to the accident."

On cross-examination, Dr. Dodge testified that, to a reasonable degree of medical certainty, Robert's back pain, and the symptoms he was experiencing in his right leg within 72 hours after the collision, *were caused by the accident*. Dr. Dodge further testified that, after reviewing all of Robert's medical records, he saw no evidence Robert had been treated for back pain prior to the collision; that also to a reasonable degree of medical certainty, he believed Robert's surgery was necessary to alleviate the symptoms Robert was experiencing in his lower back and right leg; that he believed "all" of the medical care that Robert had received from the "date of the incident going forward was reasonable and necessary as related to this crash"; that he did not believe Robert was faking or exaggerating his symptoms, and did not detect any signs of Robert "malingering" when he

examined Robert in May 2018, a few months after Robert underwent back surgery; and that many individuals who have undergone Robert's type of back surgery are "likely to have residual pain for the rest of their lives."

Unlike Dr. Ghosh, as noted Dr. Dodge opined that Robert will not likely require another spinal surgery. Dr. Dodge, however, admitted that he had only examined Robert once; that he had no new information about Robert since conducting that examination, including from Robert, his physicians, family members, and work colleagues; and thus, he was unaware that about a month before trial, Robert during a consult with Dr. Ghosh complained of back pain in the region above his fused spine.

Dr. Dodge agreed Robert was either born with the pars defect or had been living with it since early adolescence, and had lived for "45 years" and been able to do physical labor without this condition being symptomatic. Dr. Dodge also agreed to a reasonable degree of medical certainty that the "development of [Robert's] back pain was not just some crazy coincidence, but was *because of that motor vehicle crash on July 11, 2016*." (Italics added.)

*Robert's Medical Expert Opines Robert Suffered Harm in the Collision*

William Tontz, Jr., an orthopedic surgeon with a subspecialty in spinal surgery, was retained by Robert to determine whether the car accident was "causally related" to Robert's need for treatment, including surgery; and, if so, whether Robert will need any future surgery.

After performing a history and physical on Robert in October 2018 and reviewing his radiographic studies, Dr. Tontz opined with a reasonable degree of medical certainty that Robert "sustained a permanent aggravation of underlying isthmic spondylolisthesis." Dr. Tontz added, "And what that means, the lowest spine segment, L-5, and top of your pelvis is called S-1, there's a knuckle joint on each one, between that there's a piece of bone called

12

the pars, and that bone was filled in with fibrous tissue and was torn as a result of the accident causing instability. In addition, he sustained a herniation, a piece of the disc had actually popped out at the level above at the L4-5 level." In reaching this opinion, Dr. Tontz noted there was no indication in Robert's medical records or history of him ever being treated for back issues or back pain prior to the accident.

With respect to why Robert was experiencing pain down his right leg, Dr. Tontz explained, "The nerves sit on the back of the bone or are strapped to it, and as [the vertebrae] goes forward, it will pinch the nerve and can cause pain in the back, buttocks or down the leg."

Dr. Tontz opined to a reasonable degree of medical certainty that "all" of Robert's symptoms, including low back pain and the shooting pain down his right leg, "were caused by the crash and the pars fracture and the vertebrae slipping forward compressing the nerve"; and that "all" the care and treatment Robert received was "reasonable and necessary as it relate[d] to this motor vehicle crash."

Dr. Tontz further opined to a reasonable degree of medical certainty that Robert's future care will likely include an additional surgery because Robert "will develop what's called adjacent segment disease," as the next adjacent segment above the fusion tends to break down "at a very predictable rate, which is 1 to 3 percent per year." Dr. Tontz based his opinion in part on the testimony of Dr. Ghosh that Robert already was experiencing pain at the L-3, L-4 level, a complaint Dr. Tontz found was consistent with "adjacent segment breakdown."

Dr. Tontz also opined that Robert will require vocational training as he will need to find a new field of work other than in construction. Dr. Tontz explained Robert's need for such training as follows: "One is he's had a two-

13

level lumbar fusion and a two-level lumbar fusion makes it very difficult for people to get back to their usual and customary work, if it involves digging ditches or any of that sort of thing. [¶] I've been in practice for 15 years and about 50 percent of my practice is workers' compensation. When I do a lumbar fusion similar to this one on my workers' compensation patients that are involved in heavy lifting, almost a hundred percent are going to have a restriction, unless they're retired. So it's a very powerful thing when somebody had a fusion and obviously vocation rehabilitation is going to be key for him."

Dr. Tontz further explained to the jury that with respect to "statistic and impairment ratings in the workers' compensation setting," Robert's fusion resulted in about a 26 percent "whole-person impairment"; adding, "one-fourth of [Robert's] body has been rated by the American Medical Association . . . as being impaired," which Dr. Tontz found was a "pretty significant" number. Because "one-fourth is a big number," and although it was only a guideline, Dr. Tontz "[a]bsolutely" believed Robert was going to have to find a new line of work.

*Additional Expert Testimony Proffered by Robert*

Robert's biomechanical engineering and accident reconstruction expert, Eugene Vanderpol, testified regarding the actual forces to Robert's spine at the time of impact. Mr. Vanderpol opined that the force generated by the impact was significant enough to have caused the injuries to Robert's spine— acute spondylolisthesis (i.e., when the vertebrae slips forward, one over the other), and herniation at the "four, five" level.

Using the weight of the vehicles, crash data, and other factors, Mr. Vanderpol estimated there was somewhere between 2138 to 2574 pounds of "accelerating force" on Robert's spine at impact, noting that was a "pretty

14

significant event." He further estimated to a reasonable degree of "scientific certainty" that Robert's back problems were caused by the collision, stating: "With biomechanical certainty, yes. Yes, for the forces and loads that we have, this impact, for his physiological makeup, absolutely, it's very consistent."

When asked to explain his analysis in layman terms, Mr. Vanderpol testified that, as a result in the significant weight differences between the heavier Chevy and the lighter Jeep, and the fact the Jeep was stopped, Robert "would be accelerated from 0 to approximately 16 to 19 miles per hour in about a third of a blink of an eye, about in [a] tenth of a second or so. [¶] So essentially what you're looking at is [Robert] be unanticipated, not aware of the impact, impact taking place, and him being abruptly accelerated forward to the tune of about 2000, to 2500 pounds." Mr. Vanderpol analogized this impact to "being tackled by, let's say, a 300-pound linebacker at about 25 to 30 miles per hour. So about twice full[-]sprint speed and that's the type of force that we have impacted on [Robert's] back. So as far as the acute causation, it's wholeheartedly consistent. These forces are tremendous."

Unlike Officer Williams, Mr. Vanderpol opined that there were three, and not just two cars involved in the crash, as the Jeep's front bumper was damaged in the collision; that the force of the impact by the Chevy was such that it caused the Jeep to strike the car in front of it; and that the Chevy was traveling between 21.3 and 25.5 miles per hour when it struck the Jeep.

Expert witness Enrique Vega, a board-certified rehabilitation counselor and disability management specialist, testified he performed a "vocational economic assessment" of Robert. Mr. Vega explained this assessment evaluated the "impact of disability on an individual's ability to work," which included an "estimate of how this disability is going to impact

15

the person as they go through their age earning cycle." In making this assessment, Mr. Vega reviewed Robert's tax returns, hospital and medical records, medical reports, and deposition testimony.

Mr. Vega noted the first step in determining impact on earning capacity was to determine if Robert had an occupational disability, as such persons tend to earn less than those without such a disability. Using the definition of disability from the Census Bureau, Mr. Vega opined there was no question Robert was disabled, as Robert "has limitation in his ability to stand, walk, bend, stoop, lift, [and] twist" as a result of having "multiple impairments to his cervical spine." Mr. Vega classified Robert's disability as "non-severe," as opposed to "severe" or "total," because Robert still had the ability to work. However, as an almost 48-year-old man without a high school diploma, Mr. Vega further opined it will be hard for Robert to find a new job, should that become necessary.

Mr. Vega determined what Robert's future earning capacity would be both with and without the disability *if* Robert continued his employment with HCI, which analysis, as discussed *post*, was requested by the jury during its deliberations.[2] In undertaking this analysis, Mr. Vega estimated Robert's work-life expectancy without the injury was about 14 years, or the age of "social security retirement," which was about six years less than what a person might otherwise be expected to work. Mr. Vega derived the 14-year figure using Census Bureau data, and based that data on Robert's level of education and his physically demanding job, noting persons like Robert "tend

---

[2] Mr. Vega also prepared an analysis of Robert's earning capacity *if* he changed occupations, as "strongly recommended" by Drs. Ghosh and Tontz. Mr. Vega determined that Robert's loss of future earnings would be even greater than if he remained working, albeit for less time, with HCI, as Robert, in addition to earning less, would likely lose union benefits. Mr. Vega testified Robert's earnings would be $835,000 *less* if he made a job change.

16

to exit the labor market sooner than otherwise." However, because of Robert's disability from the collision, Mr. Vega determined that, if Robert remained with HCI, he would be expected to leave the labor market about eight years earlier (i.e., he would remain working for HCI for about six more years).

Using these figures, Mr. Vega opined that with the disability, and assuming Robert remained working for HCI for about six more years, Robert will earn $478,445; that without the disability and assuming Robert continued to work for HCI until retirement age, he would have earned $1,074,158; and that the difference between these two figures, $595,713, was the damages Robert sustained for future loss of wages as a result of his back injury.

Mr. Vega also was asked about the opinions of the defense's expert economist, Roman Garagulagian (discussed *post*), who, at deposition, claimed Mr. Vega's "numbers were unreliable" and "speculative." Mr. Vega testified that the data he used from the Census Bureau was "very reliable," and was in fact the "gold standard in service science," as that data is "used to draft congressional districts, it is the data . . . use[d] regarding unemployment every month, and it comes from a survey of Americans in large enough numbers as to make the standard error of measurement close to zero." Mr. Vega went on to note that the defense's expert had no training in disability or vocational rehabilitation to undertake an analysis of the "impact of disability on a person's ability to work."

*Lay Witness Testimony Proffered by Plaintiff*

After the accident but before his surgery, Robert could not do a lot of the physical tasks required by his job. Jose Vidrio, who worked with Robert up until Robert had surgery in March 2018, testified that Robert was "always

17

complaining about pain" in his back, "down to his toes," and that Robert was unable to do the "heavy stuff" required by the job, including using a jackhammer to break concrete. Mr. Vidrio stated he typically would dig about two feet down, allowing Robert to sit down on the edge of the payment and dig the soft dirt with a shovel. Mr. Vidrio also would unload the materials from their work truck when they arrived at a jobsite, as Robert was unable to do so. Although Robert was a foreman, Mr. Vidrio stated the work, including physical labor, was shared equally by both crewmembers.

Mr. Vidrio also occasionally worked with Robert before the collision. Mr. Vidrio testified that Robert then had no problems performing his job, as Robert was a "hard-working guy"; that Robert never complained of back pain; and that Robert never asked for help when doing his job.

Hector Moran, a splicing technician for AT&T, worked with Robert on an almost daily basis as Mr. Moran would meet Robert and another crewmember from HCI at the jobsite. Mr. Moran began working with Robert in March 2013, or about three years before Robert's accident, and continued to work with Robert at the time of trial. Although Mr. Moran was typically at the jobsite, he did not do any of the digging and jackhammering, or, when the job was completed, the pouring of asphalt, all of which was done by HCI.

According to Mr. Moran, before the July 2016 accident Robert was a "very hard worker," adding, Robert "was able to do every aspect of the job as it was needed to [be done], including breaking out concrete, asphalts, digging pits, doing that particular work. That's what I observed before the crash." However, after the accident, Mr. Moran observed Robert was no longer able to unload heavy bags of asphalt from the company truck. Robert also needed help unloading and using the 90-pound jackhammer.

Mr. Moran further observed that the other man in Robert's crew typically used the jackhammer, and Robert had modified the way he helped dig the "pit" to expose the lines, as Robert had to sit down and dig with his arms after his coworker had excavated a few feet into the pit. Mr. Moran also observed that since the crash, Robert's "team" is less efficient, as it takes them longer to dig the pit. Mr. Moran nonetheless still continued to work with Robert, despite having the option of changing crews, because Robert was a "very good worker."

HCI superintendent Matthew Easley testified he had known Robert for at least 19 years; that he was Robert's direct supervisor; that a foreman on HCI's two-man crews was responsible for an equal share of the physical labor; that HCI did not have a position which is considered "light duty" or which allowed a foreman merely to "direct crew members as opposed to actually doing the physical labor"; and that if a person could not perform physical labor, the person could not work for the company.

Consistent with Mr. Moran's testimony, Mr. Easley testified that after the July 2016 accident but before Robert's surgery, Mr. Easley could tell Robert was in pain just by his "body language." Robert also disclosed his pain. After surgery, Robert seemed more comfortable, but, according to Mr. Easley, Robert's coworker still needed to "pick up the slack for the things [Robert could not] do." Prior to the 2016 car accident, Mr. Easley had never heard or learned of Robert complaining of a back injury or back pain, or being hurt while working for HCI.

Michelle Mandujano, a licensed vocational nurse, testified she married Robert in 1997. During their marriage up until the July 2016 accident, Robert never had any problems doing his job. Prior to the car accident,

Michelle described their family as "very active," which included taking camping trips, including in large groups, vacations, and going to the movies.

After the accident, the family went camping once. Because Robert was in so much pain during the first night, according to Michelle the family packed up the following morning and went home. Robert also was the cook of the family before the accident. After the accident, Michelle testified Robert tried to cook for his family, but found it difficult because of pain. Michelle further testified Robert perseveres but she can tell "he's always constantly in pain."

Regarding Robert's daily activities, Michelle testified that he is unable to sit or stand for long periods of time; and that when they take walks, they have to stop and rest because of Robert's back pain. The couple also went to the movies once after the accident, but Robert had to excuse himself during the movie to "stretch."

Michelle testified immediately after the accident she drove to the scene and observed Robert "touching his back" and "leaning forward" against the Jeep while talking to a police officer. As a precaution, Michelle wanted Robert and their two children to go to the hospital. Robert told Michelle paramedics had already evaluated him and, although he had an ache, he did not believe it was necessary to go to the hospital that evening. Michelle instead made an appointment for Robert to go to urgent care the following day.

Robert was examined at urgent care on July 12, complaining of back pain. At that examination it was noted Robert's gait and "motor skills" were "normal," as was his strength and reflexes. A few days later, Robert saw chiropractor Jose Hernandez, whom Michelle had previously consulted for her own care.

Michelle testified after the accident, Robert was in "intense pain," as he not only complained about the pain in his back and leg, but she observed he walked with a limp and had trouble bending over and sleeping. Although the physicians Robert ultimately consulted recommended surgery, according to Michelle her husband was concerned about having surgery because he did not want to lose his job while recovering.

Regarding his concerns after the surgery, Michelle testified her husband suffers from anxiety because even though he is the foreman on the two-man team, he is still required to do the same amount of physical labor as his coworker; and, if Robert is unable to this work, it is possible HCI at some point will let him go. Michelle described her husband as a "fighter," and said he was doing everything possible to support his family, despite continuing to suffer pain from the accident.

*Directed Verdict*

After Robert completed his case-in-chief, outside the presence of the jury the following colloquy took place:

> Robert's counsel Mr. Lowe: "The only other one, I want to preserve my request for a directed verdict, but we can do it at the conclusion of the—
> "The Court: A directed verdict?
> "Mr. Lowe: On just the issue of substantial factor.
> "The Court: Your argument is what?
> "Mr. Lowe: That there—there is—we can wait until—
> "The Court: That this crash was a substantial factor in causing the injury?
> "Mr. Lowe: In causing harm.
> "The Court: Causing harm. Okay.
> "Mr. Lowe: The injury—the injury goes to the value of the harm.
> "The Court: Got it. [¶] Have any response?
> Stephen's counsel Mr. Cho: "Yes, your honor. CACI 5003. The jury is not entitled or—doesn't have to believe —
> "The Court: Speak up.
> "Mr. Cho: The jury doesn't have to believe what a witness says if they found that he lied about something important.

21

"The Court: All right. Motion is granted.
"Mr. Lowe: Thank you, your honor."

After the directed verdict, the defense called three additional witnesses to complete its presentation of the evidence, including Dr. Hernandez, who was Robert's chiropractor; economist Dr. Garagulagian, who prepared his own report and testified about Robert's work-life expectancy in response to the testimony of Mr. Vega; and Fred Griffen Stelzner, who testified as to the reasonable value, as opposed to the actual charges, of the medical services Robert received.

Dr. Hernandez testified he treated Robert on July 14, 2016, or three days after the accident, after Robert was referred by Michelle. Dr. Hernandez recalled he also had provided an "adjustment" to Robert after Michelle had won a "raffle." Dr. Hernandez could not recall when he adjusted Robert, as he had known Robert through Michelle for about eight years. Dr. Hernandez nonetheless did not consider Robert's adjustment to be a "medical procedure," as Robert had "not present[ed] with any problems." As such, Dr. Hernandez had no documentation regarding that prior adjustment.

In connection with the July 14 office visit, Robert filled out a questionnaire, which included a section regarding the level of pain he was then experiencing. Robert on the questionnaire complained of "lower back pain, mid back pain, neck pain and stiffness and right leg pain with—down to the foot." Robert reported that his pain was getting better and not worse; and that on a scale of 0 to 10, with 10 being severe, he was experiencing pain at about a 2 or 3 level when engaging in various activities.

After Dr. Hernandez examined Robert and took him through some "ranges of motion," Robert reported higher pain levels. Dr. Hernandez's notes showed Robert then reported his neck pain was a 5 and "frequent"; his

22

mid-back and lower-back pain was 7 to 8 out of 10 and "constant"; and his right-leg pain was 10 out of 10, although it "came and went." Dr. Hernandez testified it was not uncommon for a patient to complain of higher pain levels after being examined.

Dr. Hernandez took an x-ray of Robert's back, which showed Robert's vertebrae had slipped forward. Dr. Hernandez treated Robert for a few months, then referred Robert out for an MRI after his lower back showed little to no improvement and he continued to experience "radiating pain." Dr. Hernandez met with Robert on January 17, 2017, and informed him the MRI showed he had a "spondylolisthesis at L5-S1" and a "disc protrusion at L5-S1 and L-4, L5."

Dr. Hernandez admitted his website included various statements regarding "auto injury" and how patients are compensated if involved in a car accident. He further admitted one statement on the website provided, "auto injuries are compensated by lost wages, past, present or future"; and another statement provided compensation could include "permanent injury such as a disc injury or loss of mobility and nerve damage, and then pain and suffering in which you lose the ability to perform activities of daily living."

Dr. Hernandez also admitted his website included a "template" page with a video he had prepared "years ago" that referred to a "four-step system[] to maximize the personal injury attorney's soft tissue spinal injury claim." He denied, however, taking an "active role" in helping his patients maximize personal injury claims or advising them how to recover money through personal injury accidents. Finally, Dr. Hernandez testified he had a medical lien and, pending the outcome of the instant litigation, was awaiting payment for treating Robert.

Dr. Hernandez also testified that Robert did not have a soft-tissue injury such as "whiplash," but instead a structural injury as a result of his vertebrae shifting forward; that he diagnosed Robert both based on an x-ray taken in his office when Robert first consulted him just days after the accident, and an MRI from November 2016; and that in the soft-tissue injury cases where there sometimes is no objective evidence of structural damage, it was "really important to have good documentation of all the symptoms the individual is reporting," which is what the video and the "four-step system" on his website were referring to.

The defense also called Dr. Garagulagian, as noted. Dr. Garagulagian testified certain data relied on by Mr. Vega was "not acceptable within the community of the forensic economists," as Mr. Vega was merely using the Census data to look at "disability statistics"; and therefore, because the data was flawed, the methodology was flawed, and any future loss of earning capacity was speculative. Dr. Garagulagian also disagreed with Mr. Vega that Robert's work-life expectancy was 14 years, instead opining it was only about 12 years.

In addition, Dr. Garagulagian opined there was no medical opinion supporting Mr. Vega's conclusion that Robert's work-life expectancy was decreased by about eight years as a result of his disability. Dr. Garagulagian claimed Mr. Vega pulled that "number out of his pocket and said, here, instead of 14, now this person is to work six years, without any support." Dr. Garagulagian thus disagreed that Robert was entitled to future loss wages based on the probability he would only be able to work about six years, and not 12, as he believed, or 14, as Mr. Vega had opined.

Dr. Garagulagian also took issue with Mr. Vega's damage calculation of Robert's past loss of earnings, noting there was a "large discrepancy between

the actual losses and what the losses are claimed by Mr. Vega." Dr. Garagulagian testified Mr. Vega's damage calculation for this item of harm was inflated, as Robert only missed about four months of work due to the surgery, which did not equate to $27,000 as Mr. Vega had opined, but instead was about $16,000 or $17,000 less.

On cross-examination, Dr. Garagulagian admitted he had no training in vocational rehabilitation, or in disability and job placement with somebody who has a disability; and was not qualified to "assess the impact of somebody's disability on [his or her] ability to work." He further admitted that he did not believe Robert was entitled to any future loss of earnings because "no doctor [is] saying that [Robert] cannot work and he's currently working."

When asked to assume medical experts have opined that Robert has "some impairment, has a disability for which they are recommending he get out of the field of construction," Dr. Garagulagian stated he had neither prepared an analysis based on that recommendation nor was he qualified to make such an assessment. But Dr. Garagulagian then added, "[Robert's] currently working, so I don't see any losses."

The defense's other witness, Mr. Stelzner, opined that Dr. Ghosh overcharged for the medical services he rendered Robert, noting, Dr. Ghosh "billed in excess of approximately $50,000.00 for the same surgery that I valued at [$]7,000 and Dr. Dodge had said was worth about [$]5,000." Mr. Stelzner admitted his analysis was based "solely" on what medical providers typically accepted based on "pre-negotiated contractual rates," and not on the amounts Robert was actually billed for his treatment.

*Jury Instructions*

As relevant to the issues on appeal, the court instructed the jury with a modified version of Judicial Council of California Civil Jury Instruction (hereinafter, CACI) No. 424[3] as follows: "Robert Mandujano claims that he was harmed by Stephen Johnston's negligence. Stephen Johnston agrees that he was negligent, but denies that the negligence caused Robert Mandujano any harm/the full extent of the harm claimed by Robert Mandujano. [¶] To establish his claim against Stephen Johnston, Robert Mandujano must prove both of the following: [¶] 1. That Robert Mandujano was harmed; and [¶] 2. That Stephen Johnston's negligence was a substantial factor in causing Robert Mandujano's harm."

The court also instructed the jury with CACI No. 430[4] as follows: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct."

---

[3]    CACI No. 424, as unmodified, provides: "[*Name of plaintiff*] claims that [he/she] was harmed by [*name of defendant*]'s negligence. [*Name of defendant*] agrees that [he/she/it] was negligent, but denies that the negligence caused [[*name of plaintiff*] any harm/the full extent of the harm claimed by [*name of plaintiff*]]. [¶] To establish [his/her/its] claim against [*name of defendant*], [*name of plaintiff*] must prove both of the following: [¶] 1. That [*name of plaintiff*] was harmed; and [¶] 2. That [*name of defendant*]'s negligence was a substantial factor in causing [*name of plaintiff*]'s harm."

[4]    The court's substantial factor instruction mirrors the form jury instruction of CACI No. 430.

The court also gave the jury CACI No. 3901,[5] modified as follows: "It has been established that Robert Mandujano was harmed and that Stephen Johnston's negligence was a substantial factor in causing the harm. You must decide how much money will reasonably compensate Robert Mandujano for the harm. This compensation is called 'damages.' [¶] The amount of damages must include an award for each item of harm that was caused by Stephen Johnston's wrongful conduct, even if the particular harm could not have been anticipated. [¶] Robert Mandujano does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages."

*Closing Argument and Verdict*

During closing, Robert's counsel, Mr. Lowe, argued it was undisputed that Stephen was "responsible" for the car accident; that Stephen's "careless conduct" caused Robert to sustain a "traumatic injury to his spine"; that the injuries Robert sustained in the accident required surgery; and that "all of the care to date, all of it, was reasonable, was necessary, and was caused by the crash."

---

5    CACI No. 3901, as unmodified, provides: "If you decide that [*name of plaintiff*] was harmed and that [*name of defendant*]'s [*insert description of cause of action, e.g., 'negligence'*] was a substantial factor in causing the harm, you also must decide how much money will reasonably compensate [*name of plaintiff*] for the harm. This compensation is called 'damages.' [¶] The amount of damages must include an award for each item of harm that was caused by [*name of defendant*]'s wrongful conduct, even if the particular harm could not have been anticipated. [¶] [*Name of plaintiff*] does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages. [¶] [The following are the specific items of damages claimed by [*name of plaintiff*]: [¶] [*Insert applicable instructions on items of damage.*]"

On the latter point, Mr. Lowe argued the imaging showed Robert's vertebrae had "slipped forward, compressing that nerve, and that pars broken apart, part of the spine broken apart so that the vertebrae, entire vertebrae shifted forward. [¶] And you've heard from Eugene Vanderpol, the biomechanic, how the mechanism of injury in that crash was clearly sufficient to cause these injuries, and the defense has nobody on the other side, *and their own doctor doesn't dispute it.* Their own doctor agrees that Robert Mandujano had a traumatic injury."

Mr. Lowe further argued, "Dr. Dodge came in, and that was the doctor that the defense hired, and said, [']Yes, to a reasonable degree of medical probability, all of the harm and all of the treatment was reasonable and necessary and related to the crash.['] " Counsel then went on to argue the amount of economic and noneconomic damages the jury should award Robert, as discussed in more detail *post*.

Stephen's counsel, Mr. Cho, during closing admitted that Stephen took responsibility for "causing the accident," as "[a]ccidents happen"; that Stephen's conduct caused "some harm" to Robert; but that Stephen disagreed this "minor incident is the cause of all of [Robert's] life problems for the rest of his life, and the evidence demonstrates that." Mr. Cho added, "A key concept I need you to keep in mind is you have to think of what actually caused those harms. Caused. That's the crux here of everything that we're talking about. Did the accident cause—well, did this accident cause all of the items of harm that Mr. Mandujano is discussing? [¶] Remember, it is plaintiff's burden to show you that each of those claims were damages that were caused by this accident that happened in bumper-to-bumper traffic."

Mr. Cho also addressed the testimony of Dr. Dodge. Mr. Cho argued that Dr. Dodge found Robert pre-collision suffered from a preexisting

28

degenerate disc condition and a pars defect.  Mr. Cho further argued the case came down to credibility, as Robert's degenerative disc condition could have been the result of aging, as Robert did not report severe pain when filling out the questionnaire in Dr. Hernandez's office a few days after the accident, and Robert went to work the next day.

After additional argument, Mr. Cho addressed the special verdict form. He stated, "It is plaintiff's burden to show you that each and every single one of the harms that they're complaining of is attributable to this car accident, that CACI instruction that I showed you, caused by Stephen Johnston in this minor incident that occurred on July 11, 2016 in bumper-to-bumper traffic.

"I also want you to keep in mind this CACI instruction regarding deliberate untruths. [¶] If you decide that a witness deliberately testified untruthfully, you may choose not to believe anything that witness has said, because you can't rely on somebody who's going to lie or tell you something that's not true to your face.

"*You're going to have to go through this analysis with respect to the economic damages.* [¶] We believe that the plaintiff has failed to meet his burden with respect to these damages.

"When you look at these items that hinge entirely on the calculation that Mr. Vanderpol did, talking about impact forces that could sweep the Jeep 10 to 15 feet forward into a car, if you don't have that, how do you know what those impact forces were?  How can you rely on that force as being the cause of causing a disc herniation and tearing the pars defect, that fracture that Mr. Mandujano had?"  (Italics added.)

Mr. Cho also argued that Robert and his expert overestimated the amount of Robert's past earning losses as Robert recovered from surgery; that Robert's future claim of medical damages was inflated because he failed to

29

show by a preponderance of the evidence that an additional surgery would be necessary, as Dr. Dodge had testified; and that both Drs. Ghosh and Tontz had also testified only about 20 to 10 percent, respectively, of their patients needed an additional surgery for adjacent disorder disease following a spinal fusion.

Mr. Cho continued, "It's interesting that plaintiff wants to tell you that we got to trust everything Dr. Dodge says because even he agrees with this, but when the—when the argument about the future surgery is contrary, they want you to forget it and say that that's not credible. [¶] In the event you were to find that a future surgery was necessary, Dr. Dodge would do it for 4 to $5,000 on a cash-pay basis. What is so special about Dr. Ghosh, Dr. Kim or Dr. Tontz, who may have higher values, when you compare that to the experience of Dr. Dodge who's done 11,000 of these surgeries?"

Mr. Cho also took up the issue of loss of future earnings. He argued that, although Robert testified postsurgery he was having trouble keeping up with work because of its physical nature, his supervisor, Mr. Easley, said the work was getting done. Mr. Cho argued Robert knows what he's doing as he had worked for HCI for over 20 years, and, to suggest Robert's earnings will decrease going forward as a result of the collision and resulting surgery, was "speculative and incomplete."

Finally, Mr. Cho, near the conclusion of his closing, reiterated that, while Stephen accepted responsibility for causing the collision, "he can only be responsible for those things that are attributable to the incident. And we would ask you to use your common sense again . . . . [¶] And if plaintiff cannot meet [his] burden—and again, this is not a situation where we're saying that Mr. Johnston shouldn't be responsible for something. This is a question of whether or not the plaintiff has met [his] burden to convince you

30

that this accident, this two-car accident is what caused all of the complaints that Mr. Mandujano is complaining of."

The jury in its verdict awarded Robert economic damages as follows: $408,985.94 (past medical expenses; by a vote of 11 to 1); $194,000 (future medical expenses; 10 to 2); $27,875 (past loss of earnings; 10 to 2); and $595,713 (future loss of earnings; 12 to 0).  It also awarded Robert noneconomic damages as follows:  $500,000 (past noneconomic loss, physical pain, mental suffering; 10 to 2); and $1,000,000 (future noneconomic loss, physical pain, mental suffering; 11 to 1).  The court entered judgment in the amount of about $2.7 million as apportioned by the jury pursuant to Civil Code section 1431.2; plus awarded Robert costs (including expert fees pursuant to Code of Civil Procedure section 998) and interest.

## DISCUSSION

### I

### Directed Verdict on Causation

A. *Guiding Principles*

Stephen contends the court erred in granting a directed verdict on the issue of causation as set forth in CACI Nos. 424 and 430, in particular on the issue of whether his conduct was a "substantial factor" in causing Robert's harm.

Code of Civil Procedure section 630 in part provides:  "(a) Unless the court specified an earlier time for making a motion for directed verdict, after all parties have completed the presentation of all of their evidence in a trial by jury, any party may, without waiving his or her right to trial by jury in the event the motion is not granted, move for an order directing entry of a verdict in its favor."

31

Also relevant here is subdivision (b) of this statute.  It provides:  "If it appears that the evidence presented supports the granting of the motion as to some, but not all, of the issues involved in the action, the court shall grant the motion as to those issues and the action shall proceed on any remaining issues.  Despite the granting of such a motion, no final judgment shall be entered prior to the termination of the action, but the final judgment, in addition to any matter determined in the trial, shall reflect the verdict ordered by the court as determined by the motion for directed verdict."

Once a motion is granted under section 630, "unless the court in its order directing entry of the verdict specifies otherwise, it shall operate as an adjudication upon the merits."  (§ 630, subd. (c).)

A motion for directed verdict is in the nature of a demurrer to the evidence.  (*Estate of Lances* (1932) 216 Cal. 397, 400–401; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629 (*Howard*).)  "In determining such a motion, the trial court has no power to weigh the evidence, and may not consider the credibility of witnesses.  It may not grant a directed verdict where there is any substantial conflict in the evidence.  [Citation.]  A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party.  [Citations.]"  (*Howard*, at pp. 629–630.)  " 'Unless it can be said as a matter of law . . . no other reasonable conclusion is legally deductible from the evidence . . . the trial court is not justified in taking the case from the jury [by

32

granting a directed verdict].' " (*Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 395, italics omitted.)

We review the court's grant of a directed verdict " 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the [party opposing the directed verdict].' [Citation.] We will not sustain the judgment ' "unless interpreting the evidence most favorabl[y] to [a party's] case and most strongly against the [other party,] and resolving all presumptions, inferences and doubts in favor of the [party,] a judgment for the [other party] is required as a matter of law." ' [Citations.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*).) Applying these standards, we now turn to the merits of Stephen's contention that the court erred in directing a verdict on causation.

B. *Analysis*

1. Timing

As a threshold matter, Stephen contends the court as a matter of law lacked authority to grant a directed verdict on causation because it did so before the parties had "completed the presentation of all of their evidence in a trial by jury." (See § 630, subd. (a).) We find this contention unavailing.

First, the record shows Stephen failed to object on this specific ground when it was initially raised by Robert's counsel at the conclusion of Robert's case-in-chief. As such, the issue is forfeited on appeal. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 (*S.B.*) [noting a "reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court," and further noting the "purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected"].)

Second, subdivision (a) of section 630 allows a court to exercise its discretion to grant a motion for directed verdict *before* the parties have completed the presentation of all of their evidence to the jury. (See § 630, subd. (a) [providing a court may specify an "earlier time" before the parties have "completed the presentation of all of their evidence" to consider a directed verdict motion]; see also *Tract 19051 Homeowners Assn. v. Kemp* (2015) 60 Cal.4th 1135, 1143 [noting in a case involving statutory interpretation, " ' "[w]e begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent" ' "].)

We conclude the plain language of this statute allows a court to do exactly what the trial court in the instant case did: to hear and rule on a motion for directed verdict after (i) Robert had completed his case-in-chief, including the testimony of both his treating physician and retained medical expert; (ii) his counsel outside the presence of the jury raised the directed-verdict issue in order to "preserve" it; and most important, (iii) Stephen's medical expert, Dr. Dodge, had testified (out of order) that the collision in which Stephen admitted fault was a substantial factor in causing Robert harm. We thus conclude the court properly exercised its discretion in hearing and ruling on the directed verdict motion when it did.

Third, even assuming arguendo the court erred in granting a directed verdict on causation (CACI Nos. 424 and 430), we conclude it was harmless under the circumstances of this case. As noted, the court granted the motion only after all the medical experts—including Stephen's—had testified to a

reasonable degree of medical certainty that the car accident was a substantial factor in causing Robert harm.

As further noted, Stephen called only three witnesses after the directed verdict had been granted: Dr. Hernandez, who treated Robert a few days after the collision and who opined that the accident caused Robert's spine injuries; Dr. Garagulagian, an economist who testified on *damage* issues (i.e., Robert's work-life expectancy and his potential loss of past and future earnings); and Mr. Stelzner, who testified regarding the reasonable value of medical services, which also went to the issue of *damages*. Thus, there is no reasonable probability the court would have made a different ruling if it had deferred Robert's directed verdict motion on causation until after the defense also had presented all of its evidence.

2. <u>Merits</u>

Stephen next contends the court erred when it granted the directed verdict on causation because there "was sufficient evidence that could have supported a jury's award of no damages."

As summarized in detail *ante*, and indulging every legitimate inference from such evidence in favor of Stephen (see *Howard*, *supra*, 72 Cal.App.4th at p. 629), we conclude the record is bereft of evidence of "sufficient substantiality" to show Robert was unharmed by the accident. (See *id*. at p. 630.)

Stephen first argues there is substantial evidence Robert was not harmed in the collision based on Stephen's testimony that immediately after the accident, while pulled over on the shoulder of the freeway, Robert, in response to Stephen's question, stated he and his family were "okay." Candidly, this argument borders on frivolous.

35

Viewed in context, the record shows that Stephen only had the opportunity to observe Robert a "little bit," and that Stephen's "discussion" with Robert was "brief[]."

Conversely, the record further shows that both of the airbags in the Chevy truck driven by Stephen deployed; that Robert's adult son Adrian described the collision as a "big impact"; that Mr. Vanderpol estimated the Chevy was traveling between about 21 and 25 miles per hour when it struck the Jeep, which was stopped in traffic; that the Chevy was totaled as a result of the accident; that immediately after the accident, Robert complained of back pain, as recorded by Sergeant Williams, and as observed by Robert's wife Michelle; that the day after the accident, Robert went to urgent care complaining of back pain; that before the collision, there was no evidence Robert suffered from, or was treated for, back pain or back injury, despite his engaging in heavy physical labor for more than 20-plus years while working for HCI; that a few days after the accident when Robert complained of pain in his back and right leg, Dr. Hernandez took an x-ray and observed Robert's vertebrae were pushed forward; that all of the medical experts—including Stephen's—testified to a reasonable degree of medical certainty that Robert suffered harm from the collision; that all of the medical experts—again including Dr. Dodge—testified to a reasonable degree of medical certainty that Robert's care and treatment, including surgery, was necessary to relieve his back pain and the numbness and discomfort he was experiencing in his right leg; and that as a result of the March 2018 spinal surgery, Robert missed about three or four months of work, which even Stephen's expert admitted led to a decrease in Robert's earnings.

Reviewing the entire record, as we must (see *612 South LLC v. Laconic Limited Partnership* (2010) 184 Cal.App.4th 1270, 1279 (*Laconic*)

36

[substantial evidence standard requires review of entire record]), we conclude a simple statement from Robert that he and his two children were doing "okay" immediately after the accident does not meet the evidentiary standard to require reversal of the verdict directed on causation.

For the same reasons, we reach the same conclusion with respect to Stephen's argument that, merely because Robert went to work the day after the accident, and/or he did not immediately seek medical care after the accident after being evaluated by paramedics, individually or collectively provide substantial evidence to show Robert suffered no harm from the accident. (See *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1119 [noting a " ' "mere scintilla of evidence does not create a conflict for the jury's resolution" ' "], quoting *Nally*, *supra*, 47 Cal.3d at p. 291.)

Stephen also argues that, because Robert had an "unstable back," his physically demanding job and other activities "could have caused [his] pain" "without trauma." (Emphasis omitted.) Along these same lines, Stephen further argues that, because pain is subjective, Robert's denial of having any pain before the accident—and his corresponding alleged lack of credibility— also could have led the jury to find Robert was not harmed in the accident.

However, "could have" does not equate to "substantial evidence." (See *Dumin v. Owens–Corning Fiberglas Corp.* (1994) 28 Cal.App.4th 650, 654 [recognizing a directed verdict is appropriate when the opposing party's "proof raises nothing more than speculation, suspicion or conjecture"].)

Moreover, there is little to no evidence, much less substantial evidence, in the record showing that *before* the collision, Robert complained of, or had pain in his back, or numbness down his right leg, or had any medical history of such; had difficultly performing for more than 20 years his physically

37

demanding job, which included lifting and using a 90-pound jack hammer, digging ditches, and loading and unloading heavy objects from his work truck; had difficulty for any length of time sitting, walking, sleeping, and/or engaging in other, similar life activities; all of which he experienced *after* the collision.

Lastly, we find inapposite cases on which Stephen relies, as they involved circumstances where a jury could find the plaintiff suffered no injury whatsoever, based on the plaintiff's lack of credibility and the lack of any objective evidence to support the plaintiff's subjective claim of harm.

For example, in *Christ v. Schwartz* (2016) 2 Cal.App.5th 440 (*Christ*), the plaintiff claimed the onset of fibromyalgia after a minor car accident in which the defendant side-swept the plaintiff's car while driving about 10 miles per hour. Immediately after the accident, the plaintiff "ran up and down the street looking for witnesses" (*id.* at p. 443); called the police; and, when the police arrived, repeatedly interfered with the investigation by stepping between the defendant and the officer, who was attempting to take the defendant's statement, "even after the officer instructed [the plaintiff] to stop interfering." (*Ibid.*) The plaintiff in *Christ* also drove herself home, underwent massage and physical therapy intermittently for a year and a half, and ultimately complained only of neck pain, which she already had a history of prior to the accident. (*Id.* at pp. 443–444.)

Although the defendant in *Christ* admitted liability, this court found proper the jury's refusal to award the plaintiff any damages. (*Christ, supra,* 2 Cal.App.5th at pp. 453–456.) We noted that the plaintiff still needed to prove that the accident caused her to sustain damages; that the entirety of the plaintiff's claim was "subjective and rested solely upon her credibility" (*id.* at p. 454); that the plaintiff's credibility had been "materially impeached

38

at trial," including by a *sub rosa* video taken pretrial showing her engaging in myriad activities she claimed she allegedly could not do (*ibid.*); and that the plaintiff proffered no evidence of any "objective manifestation of injury," including x-rays and/or MRI's, to corroborate her complaints of subjective injury. (*Ibid.*)

Clearly, the circumstances in *Christ* are nothing like those presented in the instant case.[6] As we have repeatedly noted, each of the medical experts in this case—including Dr. Dodge—testified the car accident was a substantial factor in causing Robert harm. Robert's harm was also established by Robert's own testimony, and by the testimony of several other witnesses, including the officer who investigated the accident, Robert's family members, and three of his work colleagues.

A finding of harm was further supported by Robert's biomechanical expert, Mr. Vanderpol, who offered *uncontested* testimony regarding the severity of the impact on Robert's spine from the collision. And, of course,

---

[6] For the same we also find inapposite *Pralle v. Milwicz* (Ak. 2014) 324 P.3d 286 (*Pralle*), on which Stephen also relies. In that case, the defendant " 'tapped' " the plaintiff's car from behind going about three or four miles per hour, causing what the defendant claimed was no property damage to either car, and what the plaintiff claimed was a "crinkling of paint" to his car. (*Id.* at p. 289.) The plaintiff's initially claimed injury to his neck and upper back, but over the months following the accident, he also complained of injury to his "back, hip, groin, shoulder, thumb, and elbow, in addition to headaches and facial numbness." (*Id.* at p. 287.) The plaintiff also had been involved in two earlier accidents, for which he was receiving treatment near the time of the accident with the defendant; and the plaintiff had no objective evidence (i.e., x-rays or MRI's) to support his subjective claim of injury. The Supreme Court of Alaska held substantial evidence supported the jury's finding that the defendant's negligence was not a substantial factor in causing injury to the plaintiff. Again, the facts and circumstances in the instant case are nothing like those presented in *Pralle*.

Robert's harm was objectively shown by various films, and by the surgery itself.

We thus reject Stephen's contention that the credibility of the parties alone could have decided the issue of harm, and/or that the trial court improperly engaged in a weighing of credibility when it directed a verdict for Robert on causation.

We also reject Stephen's alternate contention that the court's directed verdict was overly broad. We note Stephen did not object to the breath of the directed verdict at the time it was granted or in his new trial motion. As such, his claim of error is forfeited on appeal. (See *S.B.*, *supra*, 32 Cal.4th at p. 1293.)

Reaching the merits, we note the directed verdict followed the guidelines set forth in CACI Nos. 424 and 430, summarized *ante*. The directed verdict established that Robert was harmed and that Stephen's negligence in causing the collision was a substantial factor in causing Robert's harm. It did not require the jury to award damages for any specific injury or harm claimed by Robert, as defense counsel continually reminded the jury during closing argument, as we have noted.

As such, the record fully supports the finding the trier of fact was aware it was not required to award Robert damages for each claim of injury or harm he alleged was caused by the collision. That the jury ended up awarding Robert both economic and noneconomic damages in an amount above $2,7 million, as summarized *ante*, does not support an opposite conclusion, particularly on this record. We thus conclude the court did not err in directing a verdict in favor of Robert on causation.

We next turn to Robert's damage awards for future lost earnings and for noneconomic future pain and suffering, the second main issue raised by Stephen in this appeal.

## II

## Damages

### A. *Future Lost Earnings*

Stephen contends the jury's unanimous award of $595,713 for Robert's future lost earnings should be reversed because under CACI No. 3903C, Robert failed to sustain his burden to prove with "reasonabl[e] certain[ty]" that he will lose such earnings.[7]

### 1. Guiding Principles

"Civil Code section 3283 states in part that '[d]amages may be awarded . . . for detriment . . . certain to result in the future.' Courts have interpreted this to mean that a plaintiff may recover if the detriment is 'reasonably certain' to occur. [Citations.] It is for the jury to determine the probabilities as to whether future detriment is reasonably certain to occur in any particular case." (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 97.) "There is no requirement that a plaintiff prove with certainty the extent of the harm he [or she] has suffered as a result of the defendant's conduct. [Citation.] Although ' "[i]t is desirable . . . that there be definiteness of proof of the amount of damage as far as is reasonably possible[,] [i]t is even more desirable . . . that an injured person not be deprived of substantial compensation merely because he [or she] cannot prove with complete certainty the extent of harm he [or she] has suffered." ' " (*Id.* at pp. 98–99;

---

7     The court instructed the jury with CACI 3903C in part as follows: "To recover damages for future lost earnings, Robert Mandujano must prove the amount of earnings he will be reasonably certain to lose in the future as a result of the injury."

see *Khan v. Southern Pac. Co.* (1955) 132 Cal.App.2d 410, 416 (*Khan*) [recognizing the legal principle that it is "generally a question for the jury to determine from the evidence whether or not the claimed prospective detriment is reasonably certain to occur"].)

"The power of an appellate court to review the trier of fact's determination of damages is severely circumscribed. An appellate court may interfere with that determination only where the sum awarded is so disproportionate to the evidence as to suggest that the verdict was the result of passion, prejudice or corruption [citations,] or where the award is so out of proportion to the evidence that it shocks the conscience of the appellate court." (*Uva v. Evans* (1978) 83 Cal.App.3d 356, 363–364 (*Uva*).)

2. Analysis

Here, there is substantial record evidence to support the finding that Robert's prospective detriment—a shortened work-life and the resulting loss of future earnings—were "reasonably certain" to occur as a result of the injury or injuries he sustained in the collision.

As summarized *ante*, both Dr. Ghosh—Robert's treating physician— and Dr. Tontz—his retained medical expert—testified to a reasonable degree of medical certainty that Robert at the time of trial already was showing signs of adjacent segment disorder as a result of the fusion of his L-4/5 vertebrae; and thus, at some point, depending on how long he stayed employed with HCI and continued to do physical labor, Robert ultimately would need another surgery (i.e., it was not a question of "if," but "when"). As such, both doctors testified that Robert will require vocational rehabilitation and/or training to find a new line of work as a result of his "very physical job" and the stress it was putting on his surgically repaired spine.

Dr. Tontz also opined that, using statistical and impairment ratings from the worker's compensation setting, Robert's two-level lumbar fusion placed Robert in about a 26 percent whole-person impairment, such that one-fourth of Robert's body had been rated by the American Medical Association as being impaired, which Dr. Tontz further opined was "pretty significant."

As noted, Dr. Dodge disagreed with Drs. Ghosh and Tontz that Robert will need to find alternate employment that is less-physically demanding, or that he at some point will require another surgery for adjacent segment disorder. Dr. Dodge instead attributed Robert's symptoms to his spinal surgery, opining that many patients undergoing the same type of surgery as Robert experience residual pain for the rest of their lives.

As noted however, the record shows Dr. Dodge had not consulted with Robert since May 2018. Dr. Dodge also admitted he had not received any updated information regarding Robert's medical condition since that one examination. In contrast, Dr. Ghosh had seen Robert in March 2019, or about a month before trial. Thus, as trier of fact, the jury was entitled to weigh the conflicting medical testimony and decide who to believe on this issue.

The record further shows that Mr. Vega, a board-certified rehabilitation counselor and disability management specialist, testified that Robert had a nonsevere physical disability as defined in the Census Bureau guidelines, which Mr. Vega claimed was the "gold standard" in "service science"; that as a result of being almost 48 years old without a high school diploma, Robert going forward would find it more difficult to find new employment; and that based on the medical opinions of Drs. Ghosh and Tontz, Robert likely would need to find a new line of work.

As noted, Mr. Vega opined that if Robert did not have a physical disability, he likely would be able to work another 14 years for HCI, using the social security retirement age as a benchmark in light of Robert's education level and his physically demanding job.  Mr. Vega further opined that as a result of Robert's physical disability, he likely will be able to continue working for HCI for only 6.2 more years, thus reducing his earnings from $1,074,158 to $478,445, or a difference of $595,713, which is the *exact number* the jury awarded Robert for this item of damage.[8]

"While there is no clearly established definition of 'reasonable certainty,' evidence of future detriment has been held sufficient based on expert medical opinion which considered the plaintiff's particular circumstances and the expert's experience with similar cases." (*Bihun v. AT & T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 995, disapproved on another ground as stated in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664.)

Moreover, it is not necessary that the medical expert testify a plaintiff is "reasonably certain" to be disabled in the future; rather "[a]ll that is required to establish future disability is that from all the evidence, including the expert testimony, if there be any, it *satisfactorily appears* that such disability will occur with reasonable certainty." (*Mendoza v. Rudolf* (1956) 140 Cal.App.2d 633, 637 (*Mendoza*), italics added.)  "In examining the sufficiency of the evidence to support an award of damages, it is not required that we be able to precisely recreate the jury's reasoning.  [Citation.]  We will

_____

8    Of course, as noted in footnote 2 *ante*, if the jury had awarded future loss of earnings based on Robert switching jobs, as strongly recommended by Drs. Ghosh and Tontz, the award of damages attributable to his future loss of earnings *could* have been even greater than the award actually rendered by the jury, inasmuch as Mr. Vega opined Robert's damages in this latter scenario would be $835,000.

uphold a verdict if it is within the range of possibilities supported by any of the testimony. [Citation.]" (*Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 532 (*Pellegrini*).)

Here, it "satisfactorily appears" (see *Mendoza, supra*, 140 Cal.App.2d at p. 637) from all the evidence, including the expert testimony of Dr. Ghosh, Dr. Tontz, and Mr. Vega, that it is "reasonably certain" Robert will suffer "future detriment" as a result of the physical disability he suffered in the collision.

That Dr. Dodge disagreed with the conclusions of Drs. Ghosh and Tontz; and that Dr. Garagulagian disagreed with Mr. Vega's use of Census Bureau data and his conclusions in finding Robert's work-life expectancy will be diminished as a result of the collision, does not change our conclusion on this issue. (See *Uva, supra*, 83 Cal.App.3d at p. 363 [recognizing the principle that the "power of an appellate court to review the trier of fact's determination of damages is severely circumscribed"].)

As a court of review, we do not reweigh the evidence or the credibility of witnesses in determining whether it "satisfactorily appears" from the evidence that it is reasonably certain Robert will suffer future lost earnings as a result of being physically disabled in the collision. (See *Mendoza, supra*, 140 Cal.App.2d at p. 637; *Khan, supra*, 132 Cal.App.2d at p. 416.)

Moreover, we conclude the jury award for such detriment was "within the range of possibilities" supported by the testimony. (See *Pellegrini, supra*, 165 Cal.App.4th at p. 532.) Indeed, the record shows during its deliberations the jury asked for the "breakdown spreadsheet related to exhibit 229, plaintiff's vocation rehabilitation expert testimony." The record further shows this was the spreadsheet Mr. Vega had prepared showing the reduction in Robert's earnings post-accident if he remained employed with

HCI. After inquiring with counsel, the court and all counsel agreed that the jury had only been shown this spreadsheet, and not a separate spreadsheet prepared by Mr. Vega calculating Robert's damages for future loss earnings if he had left HCI and found a new job.[9] As such, the court and all counsel agreed the jury should be given the former and not the later spreadsheet, for use in its deliberations. Using this particular spreadsheet, as noted the jury awarded Robert damages for future loss of earnings using the exact damage figure calculated by Mr. Vega.

We thus reject Stephen's contention that the jury's award of such damages was speculative and improper.

B. *Future Noneconomic Damages*

Stephen next contends Robert's $1 million award for future noneconomic damages must be reversed, or in the alternative, reduced in some amount. Stephen bases this contention on Robert's counsel's closing argument that Robert was entitled to an award of damages for anxiety as a result of the possibility he may have to make a future job change, an argument Stephen claims is entirely speculative. We find this convention unavailing.

First, we conclude Stephen has forfeited this claim of error on appeal.

Indeed, to "preserve for appeal a challenge to separate components of a plaintiff's damage award, a defendant must request a special verdict form that segregates the elements of damages. (*Brokaw v. Black–Foxe Military Institute* (1951) 37 Cal.2d 274, 280; *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 346 [(*Heiner*)]; *English v. Lin* (1994) 26 Cal.App.4th 1358, 1369; *Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 746.) The reason for this rule is simple. Without a special

---

9       See footnotes 2 and 8, *ante.*

46

verdict separating the various damage components, 'we have no way of determining what portion—if any' of an award was attributable to a particular category of damages challenged on appeal. (*Heiner*, at p. 346.)" (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1158 (*Greer*).)

Here, the record shows Stephen failed to object to the verdict form, which allowed the jury to render a single award, if any, for future noneconomic harms including not only for anxiety, but also for "physical pain, mental suffering, loss of enjoyment of life, emotional distress, . . . grief, inconvenience, and humiliation." Nor did Stephen ever ask the jury to segregate Robert's damages, if any, attributable to such harms, including for anxiety. As such, the issue is forfeited. (See *Greer*, *supra*, 141 Cal.App.4th at p. 1158.)

We further note at no time, including in Stephen's new trial motion, did Stephen object or argue that any anxiety Robert may experience from having to make a future job change was speculative. As such, for this separate reason we conclude Stephen on appeal has forfeited this claim of error. (See *S.B.*, *supra*, 32 Cal.4th at p. 1293.)

In any event, the record shows the jury received substantial evidence to support this award, including for anxiety. (See *Laconic*, *supra*, 184 Cal.App.4th at p. 1279 [substantial evidence standard requires review of entire record].) Such evidence included the testimony of Drs. Ghosh and Tontz that Robert will need vocation rehabilitation and training to find a new, less physically demanding job; that Robert himself was worried about being able to continue working for HCI because of the very physical labor required by such work; that although Robert, according to his wife Michelle, was a "fighter," he no longer was able to perform various tasks required by his job, as his coworkers also testified; that Robert, at the time of trial, was

experiencing additional back pain, which Dr. Ghosh opined was due to adjacent segment disease; and that Robert was also worried about the prospect of having to undergo another surgery to relieve his back pain, which surgery would likely be needed sooner rather than later if he continued engaging in physical labor in his job.

What's more, the jury also heard testimony supporting an award of noneconomic future damages for Robert's pain and suffering, including from the defense's own expert, Dr. Dodge, who, along with Robert's medical experts, confirmed that many people who undergo the type of surgery Robert underwent experience pain for the rest of their lives; that Robert also experienced a loss of enjoyment of life, as he no longer could take driving trips, camp with his family, or engage in other simple activities without pain, including going to the movies without having to "stretch," or taking walks with his wife without having to stop and rest.

The record also shows Robert's counsel in closing summarized the evidence supporting the various harms comprising Robert's noneconomic future damages. Using a clock as a metaphor, Mr. Lowe argued Robert was entitled to a sizeable award for pain and suffering for the duration of his life expectancy: "For the future, this concept sticks in my mind as a clock. The reason I put it as a clock is because this is a forever type of problem that is with him at all minutes of the day. From the moment he wakes up, he's in pain; to the moment he's driving to work, pain; to the moment he's at work and doing the work is the pain; going home and trying to the cooking, pain; any activities, always still in there, in the background, pain, discomfort, fatigue. Sitting around watching TV and even sleeping with that in his back, that sleep isn't real sleep. So all day long, all time long, it's going around."

Mr. Lowe also summarized the evidence supporting an award for Robert's future mental suffering, loss of enjoyment of life, impairment, emotional distress, and of course anxiety. Robert's counsel asked the jury to award Robert $3 million in noneconomic future damages. As noted, the jury was provided a single entry on the verdict form to render such an award, if any; and the jury completed this entry by awarding Robert, then about 48 years old, $1 million, an amount we conclude was justified under the circumstances of this case. (See *Uva*, *supra*, 83 Cal.App.3d at p. 363 [recognizing the "power of an appellate court to review the trier of fact's determination of damages is severely circumscribed"]; see also *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892–893 [recognizing that a plaintiff has a right to recover damages in a tort action not only for physical pain and suffering, but also pain and suffering for "fright, nervousness, grief, *anxiety*, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal [italics added]"; that "[a]dmittedly these terms refer to subjective states, representing a detriment which can be translated into monetary loss only with great difficulty"; but that "the detriment, nevertheless, is a genuine one that requires compensation [citations], and the issue generally must be resolved by the 'impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence' "].)

Based on the foregoing, we decline to reverse Robert's award of noneconomic future damages; or to reduce that award to some other number, whatever that *may* be, to account for some, if any, damages attributable to anxiety that Robert *may* have been awarded by the jury *if* he is required by his disability to find a less-physically demanding job in the future. (See *Greer*, *supra*, 141 Cal.App.4th at p. 1158.)

## DISPOSITION

The judgment is affirmed.  Robert to recover his costs of appeal.


BENKE, Acting P. J.

WE CONCUR:


DATO, J.


GUERRERO, J.